## RHODERICK M. WOODVILLE v. FRANK H. MORRILL.[1]

June 18, 1915.

Nos. 19,211—(134).

**Will — when testator is presumed insane.**

1. A person who has been adjudged insane and committed to an insane

[1] Reported in 153 N. W. 131.

---

Note.—The authorities passing upon what constitutes testamentary capacity or incapacity are reviewed in a note in 27 L.R.A. (N.S.) 1. For cases passing upon ante-testamentary declarations as evidence of undue influence see note in 3 L.R.A. (N.S.) 749.

hospital, though at liberty on parole but not discharged, is presumed to be. mentally incompetent to make a will. The presumption is not conclusive and may be rebutted by showing that the derangement of mind was not general, but limited, and had **no** necessary reference to the subject matter of the will.

**Proof of undue influence.**

2. Undue influence necessary to set aside a will, must appear from affirmative evidence and, apart from declarations of the testator, be of a character to destroy the free agency of the testator in the disposition of his property. In re Hess' Will, 48 Minn. 504, followed and applied.

**Finding sustained by evidence.**

3. The trial court found as facts that testator was of sound and disposing mind, and that the will in contest was not procured by fraud or undue influence. It is *held* that the findings are not clearly or manifestly against the evidence, within the rule guiding this court in the review of such questions.

Rhoderick M. Woodville, a brother of the testator, filed objections in the probate court for Rice county to the allowance of the last will and testament of Robert W. Woodville, deceased, presented to the court by Frank H. Morrill, the executor named therein. From the order of the probate court admitting the will to probate, contestant appealed to the district court. The appeal was heard by Childress, J., who made findings and ordered judgment affirming the order of the probate court. From an order denying his motion for a new trial, contestant appealed. Affirmed.

*J. W. LeCrone* and *Joseph Donaldson,* for appellant.

*Lucius A. Smith, Frank H. Morrill* and *Frank H. Castner,* for respondent.

BROWN, C. J.

Robert W. Woodville, a resident of Rice county, died on the seventeenth day of March, 1913, leaving what purported to be his last will and testament, in and by which he disposed of all and singular his property and effects. Subsequent to his death the will was duly presented to the probate court for allowance. Appellant, a brother of the testator, appeared and contested the allowance and probate of the will upon the grounds: (1) That the testator was of unsound

mind and without testamentary capacity; and (2) that the will was procured by fraud, duress and undue influence. After hearing before the probate court, the grounds of contest were held not sustained by the evidence, and the will was allowed and duly admitted to probate. Contestant appealed to the district court, where the issues were tried before the court without a jury, and resulted in an affirmance of the order of the probate court; the district court having found that testator was of sound and disposing mind, and that the will was not procured by fraud or undue influence. Contestant appealed from an order denying a new trial.

The only question presented by the record is whether the evidence sufficiently supports the findings of the trial court. Upon that question our conclusion, after a somewhat full and careful consideration of the evidence, is that the findings cannot, within the rule guiding this court in the determination of such questions, be disturbed. If it be conceded that this court would not have reached the conclusion that testator was mentally competent at the time of the execution of the will, had the question originally been submitted here, that furnishes no sufficient reason for overturning the findings of the trial court. 1 Dunnell, Minn. Dig. § 415. To justify that result the findings must be clearly and manifestly against the evidence. 1 Dunnell, Minn. Dig. § 411. Buck v. Buck, 126 Minn. 275, 148 N. W. 117. We are unable to reach that conclusion in the case at bar.

1. Testator was a native of the state of Massachusetts, but removed to and took up his residence at or near Northfield, in this state, many years ago, where he remained until his death, living the life of a bachelor until of the age of about 76 years. He was eccentric, and singularly peculiar in his habits of life, yet industrious and accumulated considerable property, which at the time of his death was of the value of about $15,000. He had no children and his wife died prior to the execution of the will in question. He left surviving him a brother residing at Minneapolis, and two or more nieces and nephews. By his will he bequeathed to his brother, who is blind, and to the nieces and nephews the sum of ten cents each, and devised and bequeathed the remainder of his property to non-related persons who had befriended him, and to certain

colleges, a charitable institution, and to the city of his residence. To the latter he gave $1,000 for the public library; $1,000 for the support of a rest room to be established by the city; to St. Olaf's College $1,000; to the Odd Fellows' Home, $1,000, and the residue to Carleton College. The colleges named, and also the Odd Fellows' Home, are located at Northfield, where testator resided for many years. One particularly significant feature of the will is the trivial bequest to his next of kin. In the year 1904, then of the age of 76, testator married a young woman, who died in March 1909, some four years later. Subsequent to her death testator's eccentric and peculiar characteristics became more conspicuous and noticeable. He was anxious for another wife and advertised for one in the newspapers. In response thereto several women applicants made visits to Northfield, and he presented them with gifts of money; to one he gave a diamond ring. In his efforts in this respect he spent considerable money, and expressed his willingness to turn all his property over to the woman who could "play the piano [was] morally and intellectually sound," and would marry him. His efforts were not successful. Lunacy proceedings were duly commenced in the probate court, and resulted on January 31, 1910, in his commitment to the hospital for the insane. In March following a guardian was appointed to control and manage his property. He complained bitterly of this commitment, and was released on parole after two months confinement, remaining at liberty until his death. After his release he applied to the probate court for an order removing his guardian, and the application was granted, but on appeal the order of the probate court was reversed, but for what reason does not appear from the record. The guardian continued to manage the property until testator died. His release from the asylum was procured by friends who believed that he was improperly committed, and on their assurance that he would be cared for, and not because of a conclusion on the part of the asylum authorities that he had been cured of his mental infirmity. The will was signed and executed on June 21, 1911, over a year after testator's release, and he died on March 17, 1913, at the age of 84. The evidence shows, and of this there is no controversy, that at about the date of the will testator procured the

services of an attorney, residing in Minneapolis, to draw the same, who proceeded to the residence of testator for that purpose. The evidence also tends to show that the terms of the will were dictated by testator without suggestion from any source. His attention was called to his relatives, but he indicated an adverse feeling toward them, and a purpose not to leave any of his property to them, and the will was drawn accordingly. He subsequently stated to several persons that he had executed his will, and made some extravagant statements as to the terms and provisions thereof, particularly to his guardian, many of which were without foundation.

The rules of law applied in this state upon questions of testamentary capacity are well summed up in 3 Dunnell, Minn. Dig. § 10208, and need not here be repeated. Reference will however be made to some of the authorities. The adjudication of insanity and the commitment of testator to the asylum raised a presumption of mental incapacity to make the will, and the presumption continued, notwithstanding testator had been released on parole, there being no formal discharge from the asylum. 28 Am. & Eng. Enc. (2d ed.) 94; In re Johnson, 57 Cal. 529; Rice v. Rice, 50 Mich. 448, 15 N. W. 545. But such an adjudication is not conclusive, and it may be shown either that the derangement of mind was limited and not general, or that the will was executed during a lucid interval, and that the testator then had sufficient mind and memory to know and understand the meaning and effect of his act. A large number of witnesses were sworn on the trial, about the same number of each party, and they gave their opinions that testator was and that he was not insane, and that he was capable and that he was incapable of comprehending his act. His life, character and habits were laid before the court in detail, and his eccentricities and peculiarities enlarged upon and explained. The fact that he was eccentric and strangely peculiar in his habits is far from conclusive that he was mentally incompetent to understand the business before him and the importance thereof. The eccentricities disclosed had no necessary reference to or connection with the disposition of his property by the will, but were such as are often found in men of his age, character and habits of life (McClary v. Stull, 44 Neb. 175, 62 N. W. 501; Winn

v. Grier, 217 Mo. 420, 117 S. W. 48; Archambault v. Blanchard, 198 Mo. 384, 95 S. W. 834; Manatt v. Scott, 106 Iowa, 203, 76 N. W. 717, 68 Am. St. 293), and do not necessarily indicate a general loss of intellect. In re Butler's Will, 110 Wis. 70, 85 N. W. 678. His condition in this respect existed for years, yet he was industrious, accumulated and retained a considerable property, the value and importance of which he apparently well knew and understood. Buck v. Buck, supra.

The substantial fact tending to show a general weakness of mind, rendering him insane at least upon that subject, was his unexplainable anxiety at the age of about 80 years to obtain a second wife, to whom he expressed a willingness to convey his entire estate. His conduct and efforts in this respect resulted in his commitment to the asylum. This discloses an abnormal condition of the old man's mind, but not such as to require the legal conclusion that he had totally lost his reasoning powers. Hamon v. Hamon, 180 Mo. 685, 79 S. W. 422. In fact testator frequently discussed with his intimate friends the matter of his will; he told them, both before and after he was committed to the asylum, that he intended to make his will, and to leave the bulk of his property to charitable institutions, and did not intend to leave any of it to his relatives. Without some explanation the purpose to ignore his immediate relatives would seem strange and unaccountable. The explanation, for the trial court to accept or reject, was that he thought his brother had unnecessarily permitted his father to die in the poorhouse; to one of the nephews he had conveyed a tract of land, upon the promise of the nephew to abstain from the use of intoxicating liquors, which promise the nephew broke, to the grief and disappointment of testator. This seems to have estranged testator from all his relatives. The failure to remember them more substantially was not an oversight. By two previous wills, made long before testator was committed to the asylum, the relatives were remembered only by a gift of one dollar each. They were not forgotten, but were mentioned only in this unsubstantial way. Whether his prejudice against them was well founded or not, his failure to provide for them does not as a matter of law invalidate his will. It can have that effect only when clearly the result of

130 M.—7.

derangement of mind. Abrahams v. Woolley, 243 Ill. 365, 90 N. E. 667.; Gesell v. Baugher, 100 Md. 677, 60 Atl. 481; Collins v. Brazill, 63 Iowa, 432, 19 N. W. 338; Nicewander v. Nicewander, 151 Ill. 156, 37 N. E. 698. The fact that he practically ignored them in the prior wills and at a time when there was no claim of insanity, fully warrants the inference that it was deliberate and intentional. Stackhouse v. Horton, 15 N. J. Eq. 202; Spratt v. Spratt, 76 Mich. 384, 43 N. W. 627. Though there is testimony in the record tending quite strongly to show the general mental decline and weakness of testator, the trial court found that it was overcome by that offered in support of the will, a conclusion, taking the evidence as a whole, this court cannot disturb. Crowley v. Farley, 129 Minn. 460, 152 N. W. 873. We therefore take leave of this branch of the case, with the statement that the findings of the trial court that testator was of sound and disposing mind at the time the will was executed, are not clearly or manifestly against the evidence.

2. Nor do we find from the record any reason for reversing the findings negativing fraud and undue influence. Testator had in mind for some years a purpose to give a goodly share of the property to the charitable institutions named in the will. There is no evidence that any person representing either of those institutions was instrumental in bringing testator to that frame of mind, or that he was urged or requested to make the gifts. The legacies to· the individuals named in the will were clearly based upon grounds of friendship, and represented testator's appreciation of their efforts in his behalf, particularly in procuring, and subsequent to, his release from the asylum. There is no evidence to justify the conclusion that they either solicited or suggested that they be made beneficiaries in his will. The gift to the wife of the attorney who drew the will, and who was made executor thereof, may seem somewhat difficult of ready explanation. However, if this gift was in fact the result of undue influence, it would not necessarily destroy the whole will. 34 L.R.A. (N.S.) 975. But the evidence shows that the attorney had· been particularly active in his efforts to secure the release of testator from the asylum, and it is natural enough that testator should highly appreciate those efforts. He felt humiliated and disgraced by his com-

mitment, and was anxious for a speedy release, and no doubt thought himself under substantial obligations to the attorney. The rule is well established in this state that, to justify breaking a will on the ground of undue influence, such influence must affirmatively be shown and, apart from declarations of the testator, be of a character to destroy the free agency of the testator in the disposition of the property. In re Hess' Will, 48 Minn. 504, 51 N. W. 614, 31 Am. St. 665; 3 Notes on Minn. Reports, 732. We discover no affirmative evidence in this case, of a character to justify a reversal, though certain declarations testified to as having been made by testator indicate that he was under the influence of others. But within the rule stated such declarations are not alone sufficient.

We therefore conclude upon this as upon the other branch of the case, that the findings of the trial court are not clearly or manifestly against the evidence.

We have made no effort to discuss the evidence in detail for the purpose of demonstrating or attempting to demonstrate the correctness of the conclusion of the trial court. We have followed the rule guiding us in such cases, and have examined the record with a view to the question whether the findings are clearly or manifestly against the evidence, and this is all we are required to do. Carver v. Bagley, 79 Minn. 114, 81 N. W. 757; Johnson-Van Sant Co. v. Martens, 113 Minn. 486, 129 N. W. 859; Wunder v. Turner, 120 Minn. 13, 138 N. W. 770; Andrus v. Dyckman Hotel Co. 126 Minn. 417, 148 N. W. 566.

Order affirmed.